Good morning, Your Honors. Good morning. May it please the Court, I'm Manuel Rios, and I represent the petitioner, Jaco Dukuray. I'd like to reserve two minutes for rebuttal. Okay. This is a petition for review from the Board of Immigration Appeals, denial of Mr. Dukuray's asylum and withholding petitions. The BIA actually made a decision in this case, a de novo review of the IJ's decision, so we're reviewing the BIA's decision. Mr. Dukuray is a native and citizen of Sierra Leone who bases his claims for asylum and withholding based on the harm and mistreatment that he suffered at the hands of the rebels in his country. The BIA denied his claims based on two grounds, one statutory and one discretionary. The statutory ground is that the BIA found that there was no nexus or causal requirement between a protected characteristic underneath the act and the harm suffered by Mr. Dukuray. What was the evidence? The evidence to support that, because we had the same question. Your Honor, I'm not sure if the Court is asking what is the BIA's evidence. The nexus. Okay. Well, we assert that the background country conditions and, in fact, the asylum profile and the State Department country reports, as well as the Amnesty International reports, show that basically the government and the insurgency, the rebel insurgency, are divided upon tribal lines. The respondent is a Mandingo. The legitimate government of, excuse me, the legitimate president of Sierra Leone is a Mandingo. The legitimate, Tijan Caba is the legitimate president of Sierra Leone. And he's blamed the northern tribes for the rebels who, the leader of the rebels is Fodi Sanko. He's from the northern tribes. So it's kind of divided upon tribal lines is the assertion here. In addition, the Amnesty International reports that civilians who are not considered supportive or who are considered supportive of the government are mutilated or killed. So there is background evidence that shows that tribal hostilities are, at least in part, an impetus for a civil war. But, counsel, isn't a little more required? Don't you have to then link that country report to this particular petitioner? And how is that link made? What evidence was there in the record that this particular petitioner was identified or linked with opposition to the rebels? I didn't see that in the record. Well, Your Honor, the evidence shows that he is Mandingo. The refugee card states that his tribal affiliation is Mandingo. He testified. And in regard to credibility, this court should take the respondent's testimony as true. The BIA assumed that he was credible in their decision. And as such, his testimony should not be whether or not it happened. The inquiry shouldn't be whether or not what he said happened, but rather whether or not what he said happened established his basis for asylum. I don't think anyone disputes that what he testified to happen did, in fact, occur. The missing piece is how was that linked to any protected status? Okay. I understand, Your Honor. And I would agree that, you know, the background could report aren't enough. However, Mr. Ducourie has testified that he lived in his Mandingo village, which was attacked three times. The acts of forced persecution that occurred in the context of forced persecution don't necessarily negate a finding on account of another ground. And that's really what the BIA is stating. They more than don't negate, though. I mean, the problem is that we have to conclude that no reasonable fact finder could have concluded to the contrary. And that just seems hard to do. It's difficult because he can't testify. His testimony can't explain the motivation, because he's not the persecutor. He's the persecuted. So he can't say they did it because I'm Mandingo. He needs to be able to offer up more objective measures or reasons why we can draw that inference and not only draw that inference for ourselves, conclude that no reasonable fact finder could do otherwise. And that's why anything that you can indicate from the evidence that will strengthen that inference, we really need to hear about. Sure. I understand, Your Honor. I understand a self-serving statement will not do. However, this court has found in Navas and Tarabek that the country reports are helpful in establishing these other motives. And, in fact, the country reports show that Mandingo's are aligned with the government and they're not aligned with the rebels. And they also show that people who are aligned with the government are sought out by the rebels. And just putting those two and two together, Your Honor, it establishes a fact that if he's Mandingo, if the rebels find out he's Mandingo, then he's subject to persecution more than anybody else in the country. Obviously, Sierra Leone has a turbulent history. But what we're saying is that the Mandingos are especially targeted. What specific evidence is there in the record that will make this connection? Well, Your Honor, the country reports show that he missed at 141 in the record, show that he lived in a Mandingo village, and that the leader of the rebels is from the Timini tribe, Mr. Sanko, at 100. And the country reports at 231 say that ethnic loyalty is an important factor in all aspects of the life in Sierra Leone, including the government, armed forces, and business. And I think that, you know, in the context of war, if tribal affiliation is that important in business, in military, in all aspects of the life, it would be a fallacy to think that somehow or other in a wartime that the tribal affiliations would all collapse. And, in fact, that's not what the country reports say. The country reports say that basically the rebels are drawn from the northern tribes, Mende and Hissi ethnic groups at 231, and that civilians who are accused of sympathizing with government forces at 286 are targeted. And, obviously, if Mandingos are government sympathizers and Mr. Ducourie can show his inclusion in the Mandingo tribe, well, that establishes a nexus right there. And, in addition, Your Honor, I would suggest that the facts, particular facts of this case, go beyond a forced recruitment attempt. The board characterizes all of the three violent incidents as forced recruitment attempts. However, in the first forced recruitment where the respondent's brother was abducted, his father was killed, his grandmother was killed, the respondent, who was 18 years old, was not even asked to join. In fact, they burned his head and they stabbed his foot. That's not consistent with a forced recruitment attempt. I mean, he is a ripe age at 18 to be forcibly recruited. And this is simply not consistent. Similarly, with the third attack, there's no evidence whatsoever of forced recruitment. The third attack consisted of the respondent successfully evading the rebels when they entered the village, and the respondent's sister being shot. That's it. There's no forced recruitment there. So I would suggest that what the BIA did was kind of painted it with a broad brush. We found forced recruitment in some of it, and therefore, to the exclusion of all others, there can be no other motivation. And, in fact, the inquiry should be whether or not the record, substantial evidence in the record, shows that forced recruitment is the only reason, the only motivation. And Tarbuck and Navas state that as well, Your Honor. Thank you. All right. We'll hear from the government. Good morning, Your Honors, and may it please the Court. My name is Jeffrey Bernstein, and I represent the Attorney General of the United States. The Court must sustain the Board's determination that Mr. Ducaray failed to prove any mistreatment he experienced in Sierra Leone was on account of a protective factor because that finding is supported by virtually all of the evidence of record. And, more important, the Petitioner has not identified evidence which compels a contrary conclusion. The Petitioner argues that the mistreatment experienced by him was meted out not only because of his refusal to join the rebels, but also in retaliation for political opposition and on account of his ethnicity, a member of the Mandingo tribe, and, therefore, that there's a nexus between mistreatment and the protective factor. To be kind, this argument appears to be made out of whole cloth because there's absolutely no evidence in the record, absolutely no evidence in the record that supports it. Let's go through piece by piece. First of all, if the government doesn't appear to dispute that accepting his testimony is true, he was mistreated in a way that would constitute persecution. Our focus appears to be on the on account of link. The board certainly assumed that he was credible and assumed for purposes of their adjudication that what he said was true. The board did not reach a finding on persecution, so we don't know. Well, it had to, I think. It sort of jumped over that to get to the next piece. I don't think so. The Supreme Court has said that those matters that the board doesn't adjudicate have to go back to the board if the court believes that they erred. So are you saying that we should remand this case for the board to determine whether or not there was persecution? No, I'm saying that you should affirm the board's determination that nothing that happened to him was on account of a protective factor. Okay. That's where we are, then. That's right. That's right, Your Honor. And I apologize for getting off track if I did. Again, there's absolutely no evidence that anything that happened to Mr. Ducaray in Sierra Leone was on account of either his political opinion or tribal status. He testified that neither he nor his family participated in politics or expressed a political opinion in Sierra Leone. He supported the president. He stated that he supported the president. That's his testimony. But he also said in his declaration that he didn't support either the government or the rebels. So I don't know what, you know, you can't believe that testimony because he said two different things. But in any event, even if he did support the president, he never expressed that opinion. And if he didn't express an opinion, how were the rebels able to determine that he opposed them? He never expressed an opinion. He stated his family never expressed an opinion. So there's absolutely no basis upon which to assume, presume, or find that the rebels did anything to him on account of his political opinion. Well, the inference which the Petitioner seeks for us to draw is the one, the tribal link. That is, the president is of the same tribe. And it's blurry as to whether you'd call that ethnic or political, but either one would qualify. So where is that argument? Well, let me get to that, Your Honor. That was my next point. There's absolutely no evidence either that the rebels had an anti-Mandingo bias or any reason to believe that all Mandingos opposed them. And the evidence is starkly to the contrary. The evidence record contains, first, the State Department's observation that this rebel conflict, in contrast to what counsel has told you today, the State Department says that the rebel conflict was not based on ethnic, territorial, or political factors. And that's certainly borne out by the rest of the reports as well. Mr. Ducroix ---- What's it based upon? The conflict is based upon rebels who wish to obtain political control. They're just a faction of people. Mr. Ducroix conceded in his testimony that the rebels are composed of all tribes. There are members of all tribes in the rebel movement as it existed then. It's no longer in existence. Mr. Ducroix conceded that the rebels, again, have members from every tribe in Sierra Leone. So, obviously, they can't believe that every Mandingo is against them. They've got members who are Mandingos. They can't have an incredibly crazy animus against them because they invite them into the fold and fight alongside them. Again, the State Department report, the Human Rights Watch report, the Amnesty International report, all the reports establish that the rebels are an equal opportunity mistreater. They mistreat everybody. They mistreat civilians. Their modus operandi is to create terror so that they can control areas that they already control so they can take out other areas. I mean, and the State Department report and the other reports are replete with evidence of these horrible things they do to everyone. There is absolutely no mention in any of the reports of violence against Mandingos specifically, animus towards Mandingos specifically, or that there's some political division between the Mandingos and the rebel group. We identified the rebels as a faction that's seeking to gain political control. Presumably, if they're going to abuse people, they're not going to abuse their allies. They may use this to – they may be random in terms of trying to generate fear and terror, but can an argument be made that says by opposing or becoming a target of the rebels – I mean, it's not what you're doing so much as what the rebel – the persecutors perceive that you're doing. Again, there's no evidence that would allow the persecutors, as you call them, the rebels, to perceive Mr. Dukeray as an opponent. Again, he testified that his – he and his family were not politically active. They never expressed any political opinions. They never expressed support. They didn't express anything. Again, you can't draw the inference you're seeking to draw without some indication from Mr. Dukeray that he supported somebody. But he didn't, and there's absolutely no basis upon which to assume that the rebels believed that he did, either based upon his tribal affiliation or based upon whatever political opinion he never expressed. Now, Elias Zacharias appears to be – obviously, it's controlling and appears to be the closest to this. The one potential divergence pointed out by Petitioner is that at the age of 18, they didn't carry him off or didn't seek to recruit him. Well, the Petitioner actually was asked that question at the hearing, and he said – well, they – he didn't have any explanation for it. He said that they carried off some, they killed some, and some they left alone. You know, I think it's kind of telling that they didn't. I mean, I think it supports – I know the immigration judge's adverse credibility determination is not before you, but it kind of supports them. I mean, the State Department report and the other reports established that the rebels were not interested in older people. They were interested in persecuting or harassing and intimidating older people, but the people that they were interested in recruiting were young people, were young people, obviously, whose minds they could mold, I assume. And an 18-year-old would have been a perfect target, I suppose. But in any event, Mr. Dukeray testified that there was no particular reason why they didn't choose him. They said that – he said something like they took 10 percent of the men and left the rest of – left the rest of them alone. Again, there's no evidence that Menencos constitute a social group, either, because in order – this Court's case law holds that in order to constitute a social group, and that's the niche that Mr. Dukeray wishes to fit in, they have to have some identifiable characteristic which sets them apart and which then allows them to be easily identified for persecution. There is no evidence on the record that the Menenco tribe has any peculiar characteristic as opposed to any of the other tribesmen in Sierra Leone. I'm not saying that that's not true, but there's absolutely no evidence in the record to establish that. And, therefore, Mr. Dukeray cannot – cannot prevail, even if it's established that they sought to persecute him on account of his Menenco status, which there is absolutely – and I'm going to repeat it again – there's absolutely no evidence to establish either that they targeted him on account of an opinion or his ethnic status. The evidence reveals that the only mistreatment personally experienced by Mr. Dukeray was as a result of the rebels' attempts to recruit him and the rebels' attempts to recruit his brother. Again, Elias Zacharias and the case law that the Board – a basis upon which a protected factor. If there was other mistreatment that wasn't related to recruitment efforts, it was not on account – as I've explained, not on account of a factor protected by the Act. It was on account of the rebels' propensity to deal out the violence to all they encountered, not on account of a political opinion, which was never expressed, or ethnic identity. The Court should affirm the BIA and deny the petition for review. Now, if the Board does that – if the Court does that, excuse me, then they don't need to reach the other finding of the Board to deny on a discretionary basis. But assuming that the Court would reach it, the Court would have to affirm it on – as a proper exercise of discretion. The petitioner argues – has two arguments, which he says – establishes that's error. That there's evidence in the record that the Board ignored that there were problems in the refugee camp when he left. Well, that's not true. He left six or seven months before these problems arose. So there is absolutely no basis for his assertion that he was not in a safe haven. He was in a safe haven. He left his mother there. He must have thought it was a safe haven. In fact, he testified that he was leaving his safe haven, Guinea, only because he wanted a safer haven. All right, counsel. You've exceeded your time. Thank you. Thank you, Your Honor. Rebuttal. Your Honor, under NAVAS B.I.N.S., a putative political opinion can be established by showing a relationship to – of the applicant and to others who are suspected of holding a particular political opinion. And that's basically what we have here, is that contrary to what the government is stating, the country reports do not say that everyone is involved. But the country reports state that no group is immune from the civil strife, you know, the looting that happens here. And that's not the same thing. And trying to blur these two things is just simply incorrect on the record. There is evidence at the Royal Institute's report on 158 that shows that the president blames this civil war on the northern tribes. I'd like to address the safe haven issue briefly. It is true that the refugee camps weren't closed until September. However, Mr. Dukuri left at the end of February. They were closed by the Guinean government in September, four months after he left, because of the escalating violence. Now, they weren't closed the day the violence started, certainly. They were closed because it was like a prey. They were like carrion to the birds of prey. People from Sierra Leone, people from Guinea, and people from Liberia came and preyed on these voiceless refugees that were in the camp. It was easy pickings for them. And that's the reason why they closed. So it's simply incorrect to state that on that date, the date that Mr. Dukuri was there, that it was safe. And another thing is, taking Mr. Dukuri's statements as far as he doesn't know why the guerrilla or, excuse me, the rebels came to him as authoritative, we have to remember that Mr. Dukuri is illiterate. He has a seventh-grade Islamic education. Simply to ask his opinion on why things happen and not rely on a more authoritative statement, such as the background reports that have consistently been held to be very authoritative in these matters, is simply an abuse of discretion. As such, we'd ask that this Court send this case back, amend this case with instructions to grant withholding because withholding is nondiscretionary, and for proper consideration of the exercise of discretion in regards to asylum. Thank you. Thank you, counsel. Thank you to both counsel.
judges: Rawlinson, Clifton, Marshall